GREGORIO A. RIVERA, Plaintiff and Appellant, *v.* HEIRS OF BERNABÉ CARABALLO AQUINO, ETC., ET AL., Defendants and Appellees.

No. 7992. Argued March 13, 1940.—Decided May 20, 1940.

706

J. C. Rivera for appellant. *Francisco Rodríguez Alverio* for appellees.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

This is an action for the annulment of a sale contract, revendication of a parcel of land, payment of fruits and compensation for damages. The plaintiff appealed from an adverse decision and has assigned in his brief two errors which, as alleged by him, were committed by the district court in holding: 1, that the rescision of the sale contract ought first to have been sought and, 2, that said contract was not a simulated contract. The appellees did not file any brief nor did they appear at the hearing of the appeal.

The complaint sets up three causes of action. It is alleged as ground for the first one that the plaintiff was the owner of "a jointly owned interest of one undivided half in a parcel of land" measuring twelve cuerdas located in the Hato Nuevo barrio of Gurabo; that by public deed of March 4, 1933, Bernabé Caraballo, predecessor in interest of the defendants, conveyed by means of a simulated contract to defendant José Caraballo Pagán the jointly owned interest claimed in the complaint, without any consideration and for the sole purpose of defrauding his creditors including the plaintiff, and

kept possession of it until his death, and that defendant José Caraballo Pagán has refused to convey the same, although he knew that it belonged to him.

As the grounds for the second cause of action the pertinent facts of the first cause of action are reproduced and it is further stated that the defendant heirs, first, ever since the plaintiff acquired the jointly owned interest, and then together with José Caraballo Pagán, have been in possession thereof against the plaintiff's will and refuse to deliver the same to him.

In setting out the third cause of action, the pertinent facts of the first one are reproduced and it is alleged that ever since August 4, 1934, when plaintiff acquired the jointly owned interest, the Heirs of Caraballo, first, and then together with defendant José Caraballo Pagán, have enjoyed the natural and industrial fruits of the immovable worth reasonably one hundred dollars, and further that the plaintiff, by reason of the withholding of his property by the defendants, has suffered damages which he appraises at a further one hundred dollars.

The defendants answered and denied all the facts relied upon for the three causes of action, except that in connection with their personal particulars which they accepted. They pleaded that the plaintiff had never asked for the rescission of the sale from Bernabé Caraballo Pagán as creditor of the former, and that he has never obtained a final judgment nullifying said sale, and that he can not allege collaterally either fraud or simulation.

After a decision in the Municipal Court of Caguas where the case was first tried, and appeal was taken to the District Court of Humacao where it was tried *de novo* on January 18, 1939. The evidence for the plaintiff consisted of his own testimony, that of witnesses Julio Santana and Cosme Delgado, and of two copies of public deeds. That for the defendants consisted of the testimonies of José Caraballo Pagán and Guillermo Díaz.

■ On examination by his attorney, plaintiff testified:

". . . . that he has been in business for many years: that he knows José Caraballo Pagán, defendant, who was a nephew of Bernabé Caraballo, deceased; that he had sued the latter before for debt, as the result of business deals between them; that the judgment in the former suit was in favor of plaintiff, and in order to enforce the judgment he attached the jointly owned interest belonging to Bernabé Caraballo the subject matter of this suit, and acquired it at public auction in 1934; that the marshal of the Municipal Court of Caguas delivered the material possession of said jointly owned interest to the witness who took possession thereof, with the knowledge and consent of Bernabé Caraballo and José Caraballo Pagán; that Caraballo Pagán was living at the time near said jointly owned interest, on adjoining land belonging to his father Enrique Caraballo; that after the marshal had put him in possession, he. proceeded to survey the 6 cuerdas which the marshal had delivered to him one or several days previously; that at the time the marshal delivered the 6 cuerdas to him, Caraballo Pagán, in conversation with the plaintiff and in the presence of the marshal and of Enrique Caraballo, Caraballo Pagán's father, admitted that said 6 cuerdas had belonged to Bernabé Caraballo; *that about a year prior to the publication of the notices for the sale at public auction of the 6 cuerdas of land, the plaintiff already knew that the 6 cuerdas had been conveyed by means of a simulated sale by Bernabé Caraballo to José Caraballo Pagán;* that Bernabé Caraballo died in August, 1936, and from that time Caraballo Pagán began to act as the possessor of the 6 cuerdas, although jointly with the other defendants, and they have ever since acted like that; that Caraballo Pagán, however, has never grown any fruits of any kind on said 6 cuerdas; that he has only been seen about the place after the death of Bernabé Caraballo, cutting trees, or stakes, and using all the natural fruits of the land, or grazing cattle there; that it is the other defendants who have always kept up the growing of lesser crops there; that José Caraballo Pagán did not start paying the taxes on the 6 cuerdas in litigation until after the decision of this case in the Municipal Court of Caguas in March 1938, that is, the only tax receipt paid by José Caraballo Pagán in his own behalf was that for the fiscal year 1938–39, that is, the current year; that he personally requested Caraballo Pagán several times prior to the bringing of this action in the Municipal Court of Caguas to deliver to him the possession of the said 6 cuerdas; and that during the lifetime of Bernabé Caraballo he made a similar request on dif-

ferent occasions of the latter as well; that José Caraballo Pagán, while Bernabé was living, told the witness that he was ready to deliver the land to him and even to execute a deed if Bernabé Caraballo so determined, because Bernabé Caraballo was the actual owner of the 6 cuerdas; that all the defendants have profited from the possession of the 6 cuerdas to the extent of $100 at least, and that they have moreover caused him civil damages amounting to $100 more during the last four years; but that the present title deed to the 6 cuerdas is not recordable.

"On cross-examination by the attorney for the defendants regarding the time when he became aware of the sale or conveyance, alleged to be simulated, made by Bernabé Caraballo Pagán of the 6 cuerdas, he answered as follows:

"*That for a long time he had tried to collect from Bernabé Caraballo a promissory note for $100 more or less, subscribed by the latter as the outcome of business deals between the two; that such steps to collect had been made by him in writing and verbally from Bernabé Caraballo about the years 1931 and 1932; that subsequent to such steps and in view of the fact that they were ineffective, he found out that Bernabé Caraballo had conveyed the 6 cuerdas by means of a simulated sale to José Caraballo Pagán; that that took place about 1933, although he can not remember the date exactly; that about a year before the publication of the notice of the public auction sale of the 6 cuerdas, which were adjudicated to the plaintiff, the latter already knew that Bernabé Caraballo had made the simulated conveyance of the said 6 cuerdas to José Caraballo Pagán;* that if he had not known, prior to the former action, that said conveyance was simulated, he might never have been able to file this complaint.

"On cross-examination also by the attorney for the other party, and in answer to the question why he had not brought the action before 1937 in Caguas, the plaintiff replied as follows: Because I expected a favorable result from my efforts with the defendants to avoid the same, for I did not think they would be so obstinate, specially after the death of Bernabé Caraballo when the solution of the matter depended only on José Caraballo Pagán who, as already stated by me, had admitted the simulation of the conveyance and his personal desire to deliver the land to me."

Santana testified that he worked in Gurabo as an attachment server and in 1933 he notified José Caraballo Pagán to pay the taxes due on the jointly owned interest claimed in

this action and he answered that the person upon whom devolved the payment of the taxes on the whole twelve cuerdas was Bernabé Caraballo as the exclusive owner thereof; that he then called on Bernabé who admitted to him that José had told him the truth and promised to pay him and this he did.

And Delgado, who was the adjoining owner of the land claimed herein, stated that about 1934 Rafael Batalla, marshal of the Municipal Court of Caguas, notified him as adjoining property owner that the plaintiff owned the six cuerdas whose possession was delivered to him in the presence of Bernabé and of José Caraballo; that nobody opposed the putting of plaintiff in possession thereof; that the fruits gathered by the defendants are worth $100 and the rent that should have been produced by the land is worth a further $100.

The papers consisted of copies of the deed executed before a notary by the marshal of the Municipal Court of Caguas, in behalf of Bernabé Caraballo, on October 2, 1934; of the sale to the plaintiff of the jointly owned interest in question which had been attached in the action of debt prosecuted against Bernabé in the said municipal court, and of the deed, whose simulation is alleged and which appears as having been executed by Bernabé Caraballo to José Caraballo Pagán, of the sale to the latter of said jointly owned interest.

As already stated, the evidence produced by the defendants consisted of the testimony of José Caraballo Pagán, defendant, and that of Guillermo Díaz, a witness.

The former stated, on examination by his attorney, as follows:

"That on March 4, 1933, he bought from Bernabé Caraballo Aquino 10.5 cuerdas of land, 6 of which in a parcel and 4 in another, for which he had paid him on December 1, 1932, in the presence of Guillermo Díaz and Marcelino Hernández; that he had paid $230 for said parcels of land in 10 $20-notes, 2 $10-notes and 2 $5-notes; that plaintiff Gregorio A. Rivera had demanded of him the delivery of the parcel sued on herein after Bernabé Caraballo had executed the deed

to him; that he had obtained the money from the sale of tobacco and from the proceeds of the sale of two animals; that he never met Gregorio A. Rivera (the plaintiff); that he has never seen Julio Santana, attachment server; that he has been in possession of the parcel since 1933, and that he has ever since enjoyed the fruits thereof together with the other defendants.''

## Examined by plaintiff's attorney, he stated:

''That prior and subsequent to the execution of the deed alleged to have been simulated he has always worked as a laborer and earned only 60 cents per day, when he worked; that he does not work for the Central because he prefers to work for neighboring property owners, like Marcelino Hernández, for whom he has worked and is still working, although a few days each week, as Hernández is a small property owner; that in order to become property owner he applied to the P.R.R.A. together with Marcelino Hernández, the latter as property owner, and the witness as a permanent laborer, and that this happened in 1935 or 1936, when small property owners were qualifying for admittance into the tobacco project; that said applications were made upon one's word of honor, as to the truth of their contents, by a property owner and by a permanent laborer, and in their applications permanent laborers had to state on their honor that they were not property owners; that subsequently the P.R.R.A. conveyed to him the ownership of 3 cuerdas.

''That it is a fact that plaintiff asked him to deliver to him the land in controversy, and that it is also true that the marshal of the Municipal Court of Caguas in 1934 proceeded to deliver to the plaintiff possession of said land without opposition on the part of the witness who did not say a word when the marshal did it and that the marshal did so in the presence of his father, Enrique Caraballo, as adjoining owner also; that he obtained the cash of the purchase price from the sale of tobacco, but that he does not remember to whom he sold tobacco that year, nor when he sold the same; that the balance of the cash came from the sale of two animals or head of cattle made to some butchers in Gurabo whose names he does not remember nor the date of the sale to them; that he has never lived on the land sued on herein because he has always lived with his family as a farmhand of his father Enrique Caraballo on the latter's land in a hut built thereon; that Bernabé Caraballo went on paying the taxes on the land in controversy as if no deed had been executed between the grantor and Bernabé Caraballo, for the years 1932–33, 1933–34, 1934–35, 1935–36, 1936–37, and 1937–38:

That he had paid for the first time taxes for the year 1938–39 and that he had done this after the decision in his favor from the Municipal Court of Caguas in the same action and that he owes the taxes for previous years to Bernabé Caraballo; that he has seen Julio Santana, attachment server of Gurabo, in town, but not in his home at Las Masas; that Bernabé Caraballo was blood uncle to witness José Caraballo Pagán.''

On examination by the attorney for the defendants, Díaz testified ''that he knows José Caraballo Pagán and knew Bernabé Caraballo Aquino; that he witnessed a deal between Bernabé Caraballo Aquino and José Caraballo Pagán, executed on December 1, 1932; that he saw when Caraballo Pagán delivered $230 to Bernabé Caraballo Aquino as the purchase price of 10.5 cuerdas of land that he was going to buy from him; that he knows Luis Díaz, that is, his son and brother-in-law to José Caraballo Pagán.''

Cross-examined as to whether he had any interest in this matter, he answered:

''That he had no interest, but that it was true that his son Luis Díaz married Isabel Caraballo González, now dead, by whom he had had a son who appears as defendant here under the name of Luis Angel Díaz, but that the witness had no interest in the suit notwithstanding the above.''

The court took the matter under advisement and decided the case in a judgment rendered on February 16, 1939. We transcribe from the opinion as follows:

''It is the theory of the plaintiff that Bernabé Caraballo Aquino, with the sole purpose of defrauding and injuring his creditors, fraudulently conveyed one-half interest in the property described in the complaint, and this, as appears from the testimony of the plaintiff himself, had been known to him for a year before he had obtained at a judicial sale the civil possession of the property. The annulment is sought in the complaint of the contract executed between Bernabé Caraballo Aquino and José Caraballo Pagán for want of consideration and because the same was executed for the sole purpose of defrauding and injuring his creditors. With regard to this first phase, it is the opinion of the court that the plaintiff ought to have sought the rescission of said contract in a separate action, pur-

suant to section 1243 of the Civil Code. As such action was not instituted, it devolves upon this court to determine whether or not a contract was executed between Bernabé Caraballo Aquino and José Caraballo Pagán. The evidence likewise shows that the plaintiff has never performed acts involving the material possession of the parcel purchased by him by judicial sale deed No. 19 executed before notary Luis Morales Contreras. It appears from the very averments of the complaint that Bernabé Caraballo Aquino, predecessor in interest, and José Caraballo Pagán had always been in possession of the parcel. The evidence for the plaintiff tends to show that José Caraballo Pagán bought the property from Bernabé Caraballo Aquino without consideration and that the latter lacked the means to do so. It has been shown that José Caraballo Pagán used to work on the property of Bernabé Caraballo Aquino, that he grew tobacco and that he owned two or three head of cattle. It has been likewise shown that about the years 1932 and 1933 José Caraballo Pagán harvested some tobacco which he sold at a good price. All the above leads us to the conclusion that José Caraballo Pagán saved sufficient funds for the purchase of the parcel involved herein. The evidence for the plaintiff discloses a fact that might, in a certain measure, raise suspicions as to the ownership rights of José Caraballo Pagán regarding the property bought by him. We mean the fact that he qualified to become property owner under the tobacco project of the P.R.R.A. This fact, however, by itself, is not sufficient to destroy the possibility of José Caraballo Pagán having sufficient funds to buy from his uncle one-half interest in the 12–cuerda parcel. The fact that all of them went on living on the property and enjoyed it collectively is common among our peasants. The law at times is impotent to destroy what has been customary for centuries. In a peasant family as a unit the authority of the elders prevails as a rule. It is not to be wondered at that Bernabé Caraballo Aquino, after selling his land to his nephew, might go on jointly with the latter acting as possessor From the plaintiff's evidence itself it may be inferred that the sale had not been simulated. This was publicly known, especially by plaintiff Gregorio A. Rivera who testified that a year prior to the judicial sale he knew already that Bernabé Caraballo Aquino had sold the parcel to his nephew. This was also known to Julio Santana, a witness for the plaintiff, who testified that he called on José Caraballo Pagán, to collect the taxes which were subsequently paid by his uncle, but that on the latter's death his nephew began to pay them. The plaintiff has failed to introduce sufficient evidence, in our judgment, to show the lack of consideration in the sale executed

by Bernabé Caraballo Aquino to José Caraballo Pagán. As appears from judicial sale deed No. 19, executed by marshal Rafael Batalla Córdova to Gregorio A. Rivera before notary Luis Morales Contreras, in the city of Caguas, on October 2, 1934, it was in May, 1934, that the plaintiff brought his action of debt against Bernabé Caraballo Aquino. More than a year had already elapsed from the execution of the sale contract between Bernabé Caraballo Aquino and José Caraballo Pagán.''

We will take up first the consideration of the second error assigned, viz., that which refers to the weighing of the evidence.

A mere reading of the evidence as a whole leaves the feeling that the sale contract had been simulated. A perusal thereof confirms this feeling.

The error of the trial court in weighing the same is manifest. For instance, the court said:

"It has been shown that José Caraballo Pagán used to work on the property of Bernabé Caraballo Aquino, *that he grew tobacco and that he owned two or three head of cattle.* It has been likewise shown *that about the years 1932 and 1933 José Caraballo Pagán harvested some tobacco which he sold at a good price.* All the above leads us to the conclusion that José Caraballo Pagán saved sufficient funds for the purchase of the parcel involved herein." (Italics ours.)

What defendant, who was the only one who testified regarding this particular, said, in answer the questions from his attorney, was "that he *obtained the money of the purchase price from the sale of tobacco,* and from the sale *of two animals.*"

In answer to questions from the attorney for plaintiff, he stated: "That prior and subsequent to the deed alleged to have been simulated he has always worked as a laborer and earned 60 cents per day, when he works; . . . *that in order to become property owner,* he applied to the P.R.R.A. together with Marcelino·Hernández, the latter as property owner, and the witness as a permanent laborer, . . . . that said applications were made usually upon one's word of

honor, as to the truth of their contents, by a property owner and by a permanent laborer, and in their applications permanent laborers had to state on their honor that they were not property owners; . . . . "

To further questions from his attorney, he testified: *"that he obtained the cash for the purchase price from the sale of tobacco, but that he does not remember to whom he sold tobacco that year, nor when he sold the same;* that the balance of the cash came *from the sale of two animals or head of cattle* to some butchers in Gurabo whose names he does not remember nor the date of the sale to them; . . ." (Italics ours.)

The essential facts which the court admitted as proven for concluding that the contract was valid are without support. And so in other particulars. On the other hand, the evidence for the plaintiff is convincing, full and definite.

█ The second error was also properly assigned. The contract having been simualted, that is, as there was no valid contract, it was unnecessary that the plaintiff should seek its rescission as executed in fraud of creditors or its annulment under section 1252 *et seq.* of the Code of Civil Procedure, 1930 ed.

In *González Rodríguez* v. *Fumero*, 38 497, 505, this court, through Mr. Justice Texidor, expressed itself as follows:

"In simulated contracts it is evident that there is a lack of consent and in general a lack of consideration. Then, as said by Manresa, it is the most evident case of a void contract.

"The Supreme Court of Spain, in a judgment of November 30, 1909, 116 *Jurisprudencia Civil,* page 501 *et seq.,* expressed itself as follows:

" 'Taking into consideration the fact that a simulated contract can not be mistaken for a void or voidable contract, since simulation implies by its own nature the nonexistence of the contract which is the opposite to what happens with the latter wherein, admitting its reality and certainty, it becomes necessary to examine the terms of its execution in order to determine the propriety of the nullity or rescission, and this examination is absolutely out of place as it implies a contradiction where the contract has not existed, since from

the nonexistence there can be derived no more judicial consequences than those necessarily derived from the very nonexistence, that is, those that ensue if the execution of the alleged contract had never been intended.

" 'Arguing from these premises, as the *Audiencia* of Cáceres finds that the contracts in question had been simulated, that is, that they did not exist, having been simulated for the purpose of cheating by that means the grandchildren out of their rights which were claimed at the death of their grandmother María del Rosario Fernández de Aguilar y González; it is evident that no matter the degree of propriety of the trial court in declaring the rescission of the contracts sued on, as we must argue from the fact of the simulation or nonexistence thereof, as this was not attacked in the appeal, no application can be made of the rules and precepts bearing on the rescission and not even of those bearing on the nullity itself, but only of the consequences inferred by the court, which are, as has been stated, those bringing about the leading fact of the nonexistence, that is, that the property sued on never really left the possession of the alleged vendor, and therefore it formed part of the hereditary estate at her death.'

"In the case under consideration there were certain alleged contracts of purchase and sale for the real purpose of conveying to a person gratuitously property which in the future event might be considered as the hereditary estate from the grantor. There was neither an actual conveyance of the properties nor a real and true consideration. From the deeds appeared the sale as well as the conveyance of title and the delivery of the purchase price. The fact was otherwise and at variance with the statements of the parties. Hence the simulation."

Some years before it had been held in *The People* v. *Dimas,* 18 P.R.R. 1019, 1041, that: "The legal principle that when an action of ejectment is brought against persons in possession of the thing in controversy on the strength of a title which was thought to be valid, it is necessary that the nullity of this title be first asked for, is applicable only when the action arises from such nullity, but not when the right to bring an action of ejectment is independent thereof."

See also *Succession of Suro* v. *Succession of Prado et al.,* 21 P.R.R. 227; *Oliver et al* v. *Oliver,* 23 P.R.R. 168; and *Amy* v. *Heirs of Verges,* P.R.R. 359.

If the sale from Bernabé Caraballo to defendant José Caraballo Pagán, his nephew, which appears from a deed executed on March 4, 1933, was simulated, which is the same as if it had never been made, it may very well have been disregarded by the marshal when, in executing the judgment entered against Bernabé Caraballo, he conveyed to the plaintiff the jointly owned interest involved herein and in a property which was never out of the possession of the debtor, and delivered the material possession thereof to him. All the legal effects arising from such sale, therefore, should be recognized, among which that of recovering the thing bought from the person detaining the same.

Although the action of debt was commenced, as stated by the trial judge in his opinion, after the execution of the deed of March 4, 1933, the revendicatory action lies, all the same, because here the plaintiff is not seeking the rescission of a contract executed in fraud of creditors but the return to him of a jointly owned interest in a property conveyed to him in execution of a judgment secured by him against the owner thereof and whose possession was delivered to him in the presence of and without any objection from its said owner or from the alleged former purchaser, defendant José Caraballo Pagán.

As regards the claim for fruits and damages we do not consider the evidence introduced as being sufficient. Neither the plaintiff nor the witness who testified on the matter stated any specific fact in support of their conclusions nor did they even explain the grounds thereof. This being so there is no basis for an assessment of the amount to be reimbursed.

By virtue of the foregoing, the judgment appealed from must be reversed and another entered in lieu thereof to the effect that the contract recorded on deed No. 87 executed in Caguas on March 4, 1933, before Notary Andrés Mena Latorre is invalid, as being simulated, as to the jointly owned interest to which the same refers, and that the defendants shall be ordered to deliver to and leave at the free disposal

718

of the plaintiffi the said jointly owned interest, without any pronouncement as to the reimbursement sought on account of fruits and damages, the costs to be taxed against the defendants including fifty dollars as attorney's fees.